UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No: 13-20-GFVT |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| JAMES FOREST MANNING, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon Magistrate Judge Hanly A. Ingram's Recommended Disposition (also known as a "Report and Recommendation," or "R&R") [R. 852] of the Motion to Suppress evidence [R. 754] filed by James Manning. The Magistrate Judge recommends that the Court deny Manning's motion. [R. 852.]

# I

The Magistrate Judge conducted an evidentiary hearing on the issues raised in Manning's motion to suppress and, thereafter, issued a written recommendation wherein he recommends that both Manning's motion to suppress and request for a *Franks* hearing be denied. [R. 807; R. 852.] In his recommendation, the Magistrate Judge thoroughly sets out his proposed findings of fact and conclusions of law. [R. 852.]

Manning does not offer specific objections to the factual recitation provided in the R&R but does object to the Magistrate's application of the law to those facts. [R. 859.] Because Manning does not specifically object to the Magistrate's proposed findings of fact, the Court adopts them and, for convenience, reprints them herein:

In the late evening hours of February 26, 2011, acting on a noise complaint, Whitley County Sheriff's Deputy Shawn Jackson arrived at Defendant's residence. Upon arriving at the residence, Deputy Jackson made contact with Steve Peace, a male located in the parking area of the residence. Deputy Jackson learned from Mr. Peace that Peace "was there, and he had been there to purchase pills before and that is what he was wanting to do on this particular night as well." Mr. Peace also indicated that Defendant's truck was in the driveway and that Defendant was inside the residence. By this time Kentucky State Police Trooper Leslie Moses had arrived on the scene.

After securing Mr. Peace in the back of a cruiser, Deputy Jackson proceeded to walk over to the residence and began knocking on the front door. Both Trooper Moses and Deputy Jackson testified that, while walking up to the door, they smelled an odor that was consistent (based on their training and experience) with the manufacture of methamphetamine. Trooper Moses further testified that he noticed some surveillance cameras located on the property at this time. Upon knocking on the door and announcing "Whitley County Sheriff's Department, can you open the door," Deputy Jackson testified that he could hear "a lot of movement inside, maybe even what appeared to sound like running through the residence." After hearing some "movement inside" and receiving no response at the front door, Trooper Moses proceeded to walk around the residence. Trooper Moses testified that he went around the end of the residence, the furthest away from the road, because he "couldn't make contact with anyone. I didn't know if anyone was trying to get out of the residence or if there was another entrance so that I could knock on it to attempt to make contact with them." Deputy Jackson then followed Trooper Moses around the end of the residence, towards its rear.

While walking around the residence, Deputy Jackson "accidently stepped in" a burn pile "where it looked like several items had been burnt." Deputy Jackson further testified that as he walked around "the odor became stronger than I'd had originally smelled and when looking up there was actually an exhaust fan in the window" and "the fan was on, blowing outside." According to Deputy Jackson "this was probably the strongest point of the odor." The fan was in "the last window before you go around the corner to go around behind the trailer."

Both Deputy Jackson and Trooper Moses testified that they believed at that point they had enough evidence to obtain a search warrant.[1] Trooper Moses testified that the officers disabled the surveillance cameras to ensure "officer safety" based on the information received from Mr. Peace, the odor associated with manufacturing methamphetamine, and the fear that anyone inside the residence would possess a firearm and through the cameras gain knowledge of law enforcement positions thereby posing a "grave threat" to law enforcement. Trooper Moses then began relaying information to Trooper Tony Dingus, who was located at his residence a short distance away from the scene, as Dingus was typing the search warrant materials. Around the same time, Deputy Jackson left

the scene in order to get more information for the search warrant such as "the mileage and the direction" from the Corbin City Hall to the residence.

While Deputy Jackson was away from the scene, a female individual, later identified as Kendra Sutton, came out from inside the residence. Trooper Moses testified that Ms. Sutton was "quite upset" and "she came stating over and over and over, 'help him. I think he is dead. He's overdosed. You all need to help him.'" Law enforcement initially detained Ms. Sutton "so that she couldn't flee or pose any threat to herself" and Ms. Sutton repeated that she thought "he's overdosed." Trooper Moses then testified that, upon receiving this information, he and another deputy went inside the residence and after entering the front door "I could see Mr. Manning was laid in the floor slumped over." Defendant was not responsive at that time. Trooper Moses stated that he could see a firearm[ ] "within two to three feet of where Mr. Manning was located." Moreover, when the officers attempted to move Mr. Manning, "some pills" fell onto the floor. Troopers Moses testified that he[ ] then performed a protective sweep of the house, specifically he "opened the two doors right there in close proximity to where we were at. It was a door to the bathroom. Opened it, looked inside, there was no one in there. And then to the, to the very back bedroom. And opened it, didn't see anyone in there; but saw a bunch of paraphernalia that was in there. Several bottles with tubing kind of linked together in there." Based on his training and experience, Trooper Moses testified that these bottles "appeared to be a meth lab or an HCL generator of some sort." The officers did not see any other firearms during the sweep.

Trooper Moses testified that, after removing Mr. Manning, the door was closed and the officers did not go back into the trailer until the search warrant was obtained.[ ] Law enforcement called an emergency vehicle to take Defendant to the hospital within "a very short timeframe" after they got him outside of the residence. The information about Kendra Sutton and the entry into the residence were relayed by Trooper Moses to Deputy Jackson who was not present at the time. Once the warrant materials were completed by Trooper Dingus, Deputy Jackson was the officer who took it to Whitley County District Judge Fred White in the "early morning hours" of February 27, 2011.

The "Affidavit for Search Warrant" was signed by Deputy Jackson, and then by District Judge Fred White, at 2:05 a.m. on February 27, 2011. Similarly, the search warrant was signed on February 27, 2011, and returned executed on February 27, 2011, however a time is not indicated on the return. In relevant parts, the affidavit provides that the "affiant also observed burn piles in plain view of the drive way," "observed a strong chemical odor coming from inside the residence," and that "while securing the scene a female later identified as Kendra Sutton exited the residence and stated James Manning had overdosed and needed help." Furthermore, the affidavit indicates that, while in the residence, the affiant "observed a very strong chemical smell along with Mason jars containing a milky

liquid substance inside it. Officers also observed in plain view coffee filters, and zip lock baggies along with firearms."

After executing the search, officers recovered several firearms, video equipment, a pill believed to be oxycodone, three active "one step" methamphetamine labs, three composition style notebooks that were consistent with drug trafficking, and a small amount of cash.

[R. 852 at 2-6 (citations to the record and footnotes omitted).][1]

While Manning does not object to the above factual recitation, he does object with some specificity to the Magistrate's legal conclusions. Before considering Manning's objections, a brief synopsis of the Magistrate's conclusions provides some context. The Magistrate Judge ruled that the Officers' entry into the curtilage of Manning's home did not offend the Fourth Amendment because of the "knock and talk" exception to the warrant requirement. [R. 852 at 6-9.] While executing the knock and talk, the officers observed an odor emanating from the house, a fan in the window, and a burn pile in the yard. The Magistrate Judge suggests that these observations were properly included in the affidavit for a search warrant as they were in the officers' plain view. [*Id*. at 9-11.] Next, the Magistrate concluded that the Officer's entry into Manning's trailer was justifiable due to exigent circumstances. [*Id*. at 11-15.] Once inside the trailer, the Officers performed a protective sweep which was also deemed appropriate. [*Id*. at 15-19.] After considering these issues, the Magistrate concluded that suppression would not be warranted even if the Fourth Amendment was violated, because probable cause supported both the issuance of the search warrant and the subsequent search of the trailer.

---

[1]    The Court notes only one minor correction to the Magistrate Judge's proposed facts. The Magistrate states that the "affidavit indicates that, while in the residence, the affiant 'observed a very strong chemical smell along with Mason jars containing a milky liquid substance inside it.'" [R. 852 at 6 (quoting R. 796-2 at 2.] A review of the affidavit shows that the affiant attested that the mason jar was actually observed by "officers," rather than the affiant himself. [*See* R. 796-2 at 2.] Where the affiant refers to items he personally observed, he indicates so by referring to himself as "the affiant." [*See* id.]

[*Id*. at 20-22.]  Manning also argued that the search warrant should have been suppressed, first, because it lacked a notation with the specific time of service as required by Kentucky Rule of Criminal Procedure 13.10, and, second, because of errors in the affidavit supporting the warrant.  The Magistrate considered these arguments and concluded that suppression is unwarranted.  [*Id*. at 20-26.]

Manning now challenges the Magistrate's conclusions regarding (1) the Officer's decision to approach the back of his trailer after nobody answered at the front door, (2) the Officer's decision to enter his trailer and to perform a protective sweep, and (3) the affidavit supporting the search warrant.  [*Id*.]  These objections trigger this Court's obligation to conduct a *de novo* review of the analysis on all those points to which Manning objects.  28 U.S.C. § 636(b)(1)(c).  Having satisfied this duty, and for the reasons provided below, the Magistrate Judge's recommended disposition will be **ADOPTED** for the reasons stated herein, Manning's objections will be **OVERRULED** and Manning's Motion to Suppress will be **DENIED**.

## II

The Fourth Amendment governs here.  It provides that "the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated and no warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularity describing the place to be searched and persons or things to be seized."  U.S. Const. Amend. IV.

### A

### 1

As noted by the Magistrate, a police officer's "[w]arrantless intrusion onto the curtilage of a person's home, absent an exception to the warrant requirement, is a violation of the Fourth Amendment."  [R. 852 (citing *United States v. Dunn*, 480 U.S. 294, 300 (1987)).]   One such exception is an investigative technique, known as a "knock and talk," has has been recognized by the Supreme Court: "police officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a "knock and talk," *i.e.,* knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence."  *Florida v. Jardines*, 133 S. Ct. 1409, 1423 (2013) (citing *Kentucky v. King*, 131 S. Ct. 1849, 1862  (2011)).

The question presented in this case is about the scope of this exception.  Manning does not argue that the officers' initial approach to his front door was improper but, challenges whether the "knock and talk" doctrine further justified their decision to walk around the house to see if anyone was trying to escape or if there was another entrance where the officers could attempt to make contact.

As the Magistrate Judge explained, "where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take *reasonable steps* to speak with the person being sought out even where such steps require an intrusion into the curtilage." *Hardesty v. Hamburg Twp.,* 461 F.3d 646, 654 (6th Cir. 2006) (emphasis added).  Manning contends that the officers acted unreasonably in remaining on his curtilage after nobody answered at the front door.  The question presented is twofold.  First, were there sufficient indications that a person was in the residence?  Second, did the officers take "reasonable steps" aimed at contacting the persons inside or was the officers' continued presence on Manning's property unreasonable?  *See Hardesty,* 461 F.3d at 654.

First, there is no question that  officers had ample indication that someone was in the house.  Steve Peace told them that Manning was home [*Hearing* at 37:24-37:40] and this was later confirmed by Deputy Jackson who heard movement inside the house [*Id*. at 40:36-40:42].  Manning does not contest this point.

Second, the Court must consider whether it was reasonable for the Officers to approach the back of the home to make contact.  In an effort to show that the Officers' actions were not reasonably calculated at making contact with the persons inside the house, Manning notes that the evidence failed to show (1) that there were walkways accessible to the public that led to the rear of the house, (2) that there was a porch or steps at the rear door, or (3) that the area surrounding the trailer was sufficiently public to justify the police officers' exploration.  [R. 859 at 2.]  These factors sometimes aid Courts in determining whether police actions were reasonable.  *See Carroll v. Carman*, 135 S. Ct. 348, 349 (2014) (discussing knock and talk exception but not deciding a bright line

rule).  These factors are not, however, necessarily determinative of whether an officers actions were reasonable.

For example, in *Hardesty* there were no pathways leading from the front yard to the back deck.  *See Hardesty*, 461 F.3d at 649.  Furthermore, the fact that there was no back porch or deck cannot render the Officers' decision to walk to the back of the house unreasonable.  How would the officers know if there was a back deck with a door until they walked around the house to look?  Finally, Manning argues that the area surrounding the trailer was "insufficiently public" to justify their decision to walk around back, noting that the area behind the trailer was grown up.  This is confirmed by the testimony of Trooper Moses.  *Moses Testimony* at 2:24:31-2:24:44.  Of course, Moses would not have known that the area around the back door was grown up unless he walked around the house to figure this out.

In his objection, Manning cites to a very recent Supreme Court decision, *Carroll v. Carman*, 135 S. Ct. 348, 349 (2014), to demonstrate how unsettled the law surrounding this subject is.  In *Carroll*, the Supreme Court considered cases from many different circuits that discuss the scope of the "knock and talk" technique but, rather than provide the Court with a bright line rule, the Supreme Court chose to save the question for another day.   If anything may be taken from *Carroll* regarding the scope of the "knock and talk" doctrine, it is that the question of whether "a police officer may conduct a 'knock and talk' at any entrance that is open to visitors rather than only the front door" remains unanswered.  *Id*. at 352.

Under the controlling law of this Circuit and the circumstances presented in this case, the knock and talk exception justified the Officer's decision to walk around the

house.  The Officers had sufficient indication that persons were in the house and, after knocking on the front door was unsuccessful, took reasonable steps to contact the persons inside the house by approaching the back door.

## 2

### A

Manning next objects to the officer's warrantless entry into his trailer.  [R. 859 at 3-4.]  According to Manning, "there were no exigent circumstances that required law enforcement to enter [his trailer] after [Kendra Sutton] came out of the residence stating something to the effect that [he] had overdosed."[2]  [R. 859 at 3.]  While Manning might be ungrateful that law enforcement intervened during his drug overdose, he is incorrect in asserting that they were unjustified in entering his home.  The Supreme Court has very recently reaffirmed that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Mincey v. Arizona*, 437 U.S. 385, 329 (1978)).  When considering whether such exigent circumstances are present, the Court considers the "'totality of the circumstances and the inherent necessities of the situation at the time.'" *United States v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006) (quoting *United States v. Rohrig,* 98 F.3d 1506, 1511 (6th Cir. 1996) (citation and quotation marks omitted)).  The test is an objective one; "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,* justify the action.'"  *Stuart*, 547

---

[2]      The record reflects that Ms. Sutton's statements were far more clear that Manning leads one to believe.  Manning suggests that Sutton told officers "something to the effect that Manning had overdosed."  [R. 859 at 3.]  Trooper Moses recalled that Kendra Sutton exited the trailer and was "quite upset," stating " 'help him. I think he is dead. He's overdosed. You all need to help him.' " [*Moses Testimony* at 2:28:12-2:28:37.]

U.S. at 404 (citing *Scott v. United States,* 436 U.S. 128, 138 (1978) (emphasis added)). As the Magistrate Judge noted, "officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." [R. 852 at 12 (quoting *Michigan v. Fisher*, 558 U.S. 45, 49 (2009).]

In the case at hand, Steve Peace told officers that the occupant of the home was inside and sold drugs. [Suppression hearing at 37:15-37:24.] While on the front porch, Officers had "smelled an odor that was consistent (based on their training and experience) with the manufacture of methamphetamine." [R. 852 at 2 (citing *Jackson Testimony* at 39:48-40:07; *Moses Testimony* at 2:18:48-2:19:05).] The Officers again smelled this odor coming from a ventilation fan when they were walking around the house to knock on the back door. [*Jackson Testimony* at 43:21-43:40.] Finally, Kendra Sutton told the officers that Manning was overdosing and that she believed he was going to die. [*Moses Testimony* at 2:28:12-2:28:37.] These circumstances are certainly sufficient to justify the Officer's entry. *See Stuart*, 547 U.S. at 403 (Officer's decision to enter home reasonable where officers saw, through a door and windows, an altercation between five persons and one of those persons was spitting blood in a sink); *Hardesty v. Hamburg Twp.,* 461 F.3d 646, 654 (6th Cir. 2006) (Officers decision to enter house was not fourth amendment violation where Officers had information that underage persons were drinking and after seeing "very young man lying on the couch with blood on his hands and pants who appeared not to be breathing."); *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 361 (6th Cir. 2013) (Officers decision to enter house, without warrant or permission, was reasonable based on 911 call soliciting help for drug overdose, officers'

knowledge and observations confirming overdose and families efforts to keep officers out of home.)

Contrary to Manning's argument, there is no indication that the officers' intended to enter the home before attaining a warrant.  As explained at the suppression hearing, Officers believed they had sufficient grounds to attain a search warrant prior to Sutton's plea for help.  [*Jackson Testimony* at 45:31-45:35; *Moses Testimony* at 2:24:52-2:25:00.] Ultimately, this question is inconsequential because the determination of whether the entrance was reasonable is an objective one.  *See Stuart*, 547 U.S. at 404.

Alternatively, the Court notes that while the Government does not make the argument, it could be determined that the Officers had consent to enter the home. Warrantless entry based on consent of a third party is valid when the police reasonably believe that the consenting person possesses authority over the premises.  *Illinois v. Rodriguez*, 497 U.S. 177 (1990).  Whether the person consenting actually has authority to consent is ultimately not as important as whether it is reasonable for the officers to believe that they did have consent at the time of entry.  "Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably."  *Illinois*, 497 U.S. at 177.  The Court need not consider this issue.

The officers reasonably entered Manning's home to provide him with emergency aid only after Kendra Sutton exited and expressed her concern that he was dying.  No Fourth Amendment violation is found to have occurred, as an entry under these

11

circumstances satisfies the exigent circumstances exception to the general warrant requirement.  For these reasons, Manning's objections are overruled.

**B**

Manning next challenges the officers' decision to employ a protective sweep after they entered his residence.  [R. 859 at 3.]  According to Trooper Moses, the "protective sweep" consisted of opening two doors "right there in close proximity to where we were at."  [*Moses Testimony* at 2:30:49-2:31:31.]  One door led to a bathroom and the other to a back bedroom.  Nobody was in either room but Moses did observe paraphernalia in the bedroom, including "[s]everal bottles with tubing kind of linked together" which "appeared to be a meth lab or an HCL generator of some sort."  [*Id.* at 2:30:49-2:31:41.]  After looking in these two rooms, no further search was conducted until after the officers received a search warrant.

First, Manning asserts the sweep was unnecessary because Manning was incapable of reaching a weapon or dangerous instrument that could harm the Officers.  [R. 859 at 4.]  It does not matter, however, whether Manning was capable of reaching a weapon because the purpose of a protective sweep is to protect officers from dangers in the home separate and apart from the defendant.  See *United States v. Colbert*, 76 F. 3d 773, 777 (6th Cir. 1996) (Recognizing that the Defendant's "dangerousness is not germane to the inquiry into whether the police may conduct a protective sweep in response to a reasonable suspicion of a threat from some *other person* inside the home.")

Second, Manning argues that the sweep was unjustified because the Officers had no reason to believe that a person other than Manning was in the house who could pose a threat to the officers.  Specifically, he argues that there was only some "vague assumption

that more than one person was in the residence and that is insufficient to justify a protective sweep incident to an arrest." [R. 859 at 3 (citing *U.S. v. Archibald*, 589 F. 3d 289 (6th Cir. 2009)).] This objection requires a more thorough review of the law on the subject.

Police officers are justified in performing two different types of protective sweeps subsequent to arrest, depending on the situation:

> The first type allows officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie,* 494 U.S. at 334, 110 S.Ct. 1093. The second type of sweep goes "beyond" immediately adjoining areas but is confined to "such a protective sweep, aimed at protecting the arresting officers[.]" *Id.* at 334-35, 110 S.Ct. 1093. The first type of sweep requires no probable cause or reasonable suspicion, while the second requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334, 110 S.Ct. 1093.

*United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009).[3]

The Magistrate Judge did not consider whether the sweep was permissible per the less-stringent, first category of sweeps explicated in *Buie* and *Archibald.* Rather, the Magistrate Judge found that the sweep was justified under the second, more-stringent category as "there were articulable facts and circumstances that would warrant a reasonably prudent officer to believe that the area to be swept potentially harbored an individual or other risk of danger." [R. 852 at 19.]

After considering the evidence, this Court finds that the officers' sweep is justified under the first, less-stringent *Buie* test. When the officers are only searching "spaces immediately adjoining the place of arrest from which an attack could be

---

[3]     As the Magistrate Judge explained, "the protective sweeps authorized in *Buie* are authorized in more contexts than just conducting arrests." [R. 852 at 16.] Manning does not object to this point.

immediately launched," there is no need to show either probable cause or reasonable suspicion. *Buie,* 494 U.S. at 334.

According to the Officer's testimony, they went in the front door, looked to the left through the living room, where they "could see Mr. Manning was laid in the floor slumped over." [*Moses Testimony,* at 2:29:07-2:29:22.]  After checking on Manning and making sure that there was not a bullet in the chamber of a gun that he found near Manning, Trooper Moses opened two doors "right there in close proximity to where we were at." [*Id*. at 2:30:49-2:31:31.]

This is not a case where the officers went to another floor of the residence or through multiple doorways to search a room disconnected from the space where they found the defendant.  The sweep was appropriately limited to areas contiguous to the room where Manning was located.  This is exactly the type of sweep that *Buie* allows without requiring any justification from officers. *See also United States v. Newsome*, 504 F. App'x 463, 466 (6th Cir. 2012) (Upholding protective sweep when Defendant was arrested in his kitchen but officer swept his nearby bedroom without either probable cause or reasonable suspicion); *United States v. Kaler*, 11 F.App'x 400, 402 (6th Cir. 2001) (finding that officers' actions were constitutional, without either probable cause or reasonable suspicion, in not only searching the bathroom immediately adjoining the space of arrest but also by pulling back the shower curtain to look in the bathtub.); *United States v. Thomas,* 429 F.3d 282, 287–88 (D.C.Cir. 2005) ("If an apartment is small enough that all of it immediately adjoin[s] the place of arrest and all of it constitutes a space or spaces from which an attack could be immediately launched, then the entire

14

apartment is subject to a limited sweep of spaces where a person may be found.")
(internal quotations omitted).

If it was determined that the officers' sweep extended beyond those areas immediately connected to the place where Manning was found then it would be a closer question. The Government would have the more difficult task of "articulat[ing] facts that would warrant a reasonably prudent officer to believe that the area to be swept harbored an individual posing a danger to those on the scene." *United States v. Biggs*, 70 F.3d 913, 915 (6th Cir. 1995). As the Magistrate Judge explained, a protective sweep may also sometimes be reasonable to ensure the safety of EMS, paramedics and others who would be treating an overdosed individual. *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 362 (6th Cir. 2013) (citing *Thacker,* 328 F.3d 244, 253 (6th Cir.2003) (upholding as objectively reasonable officers' entry and subsequent protective sweep to determine "whether anything or anyone in plaintiffs' home posed a risk of danger either to themselves or to the paramedics who sought to enter the home to attend to the injured, or, alternatively, to someone inside the home")).

A number of facts make it reasonable for officers to have been concerned about their safety when they entered the home of James Manning. First, it is undisputed that officers did not know how many people were in the residence. As noted before, Deputy Jackson testified that he could hear "a lot of movement inside, maybe even what appeared to sound like running through the residence" when he was knocking on the front door. *Jackson Testimony* at 40:24-40:43. Steve Peace was at the residence to purchase drugs when the officers arrived. Another individual, Kendra Sutton, had left the residence while the officers were there. There is no doubt that officers wish they knew

15

how many persons were in the residence when they entered, but, as the Magistrate Judge noted, "a protective sweep may be permissible even when the agents have no certain knowledge that other individuals are in the house." *United States v. Maldonado*, 472 F.3d 388, 394 (5th Cir. 2006) (abrogated on other grounds by *Kentucky v. King*, 131 S. Ct. 1849, 1853 (2011)).

Second, the presence of a security camera system outside the trailer also reasonably raised officers' suspicions. Trooper Moses testified that, based on his training and experience, drug traffickers often have such security systems placed outside their residence. [*Id*. at 2:26:50-2:27.] Third, Steve Peace had told officers that he was there to purchase drugs. As the Magistrate Judge recognized, "[e]xecuting a warrant in a home— particularly a home used in a narcotics conspiracy—is 'the kind of transaction that may give rise to sudden violence.'" *United States v. Taylor*, 666 F.3d 406, 410 (6th Cir. 2012) (quoting *Michigan v. Summers,* 452 U.S. 692, 702 (1981)). While "officers may not justify a protective sweep solely on the ground that the arrested individual was suspected of drug dealing," they may perform such a sweep when they have "more than a generalized suspicion of the risks associated with narcotics investigations." *Perkins v. United States*, 127 F. App'x 830, 836 (6th Cir. 2005). Fourth, the officers suspected, based on their observations and training, that methamphetamines were being manufactured inside the trailer. This, alone, can sometimes create a sufficient exigency to justify a search. *See United States v. Atchley*, 474 F.3d 840, 851 (6th Cir. 2007) (Despite fact that officers exceeded the scope of a protective sweep, evidence that occupants of hotel room were manufacturing methamphetamines provided sufficient exigency to justify otherwise impermissible search); *see also United States v. Purcell*,

526 F.3d 953, 961 (6th Cir. 2008) (discussing *Atchley* and recognizing that evidence "of an ongoing methamphetamine lab," may be sufficient exigency to justify warrantless search); *see also United States v. Rhiger*, 315 F.3d 1283, 1290 (10th Cir. 2003) (holding that warrantless entry was justified where agents observed defendants buying materials to make methamphetamine, smelled the odor of cooking methamphetamine, and were aware of the "the potential explosiveness of an active methamphetamine lab"). Finally, after the officers entered the trailer, their concerns about the danger of the situation were substantiated as they found a gun in close proximity to Manning.

While it would clearly be reasonable for the officers to fear for their safety in Manning's home, *Buie* makes it clear that a more extensive sweep requires a statement of "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors *an individual posing a danger to those on the arrest scene*." *Buie,* 494 U.S. at 334 (emphasis added). This presents a close question because the most concrete threat to the officers results from the methamphetamine that was being cooked. While the Court knows from the Sixth Circuit's holding in *Atchley* that an operational methamphetamine lab can, in and of itself, sometimes create a sufficient exigency to search, it is less clear that such an operation may serve as the basis for a protective sweep. Ultimately, this question need not be answered because the search was appropriately executed under *Buie's* first, less-stringent test.

This Court's conclusion is further buttressed by the fact that after the Officers looked in the two rooms, they stopped searching, closed the door to the trailer and did not go back until after they had obtained a search warrant. [*Id*. at 2:34:13-2:34:23.] This is

exactly what they should have done.  *See Buie,* 494 U.S. at 335 (Protective sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.").

**3**

Manning asserts that he should have been given a hearing on errors in the Affidavit for a Search Warrant because of the Supreme Court's holding in *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  In *Frank*s, the Supreme Court noted that an affidavit supporting a search warrant is presumed valid, but that:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Id.* at 155-56.  The Court further explained that:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient.

*Id.* at 171.  False statements are treated differently depending on whether they are, as described above, affirmative misstatements, or omissions.  "[T]here is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement."  *United States v. Neal*, 577 F. App'x 434, 450

18

(6th Cir. 2014) cert. denied, No. 14-7149, 2015 WL 133330 (U.S. Jan. 12, 2015) (citation

omitted).  "[A] *Franks* hearing is only merited in cases of omissions in "rare instances."

*United States v. Graham,* 275 F.3d 490, 506 (6th Cir. 2001) (citing *Mays v. City of*

*Dayton,* 134 F.3d 809, 815 (6th Cir. 1998), *cert. denied,* 524 U.S. 942 (1998)).

Manning complains about the following alleged falsities.  First, Officer Jackson

only testified to one burn pile being outside the residence but the Affidavit stated there

were "burn piles."  Second, Trooper Moses only saw one gun on the premises but the

Affidavit stated there were "firearms."  Finally, Manning argues that the Affidavit states

that "Jackson saw 'Mason jars containing a milky substance inside it.'"  [R. 859 at 2

(quoting *Affidavit for a Search Warrant*).]  Because Jackson had already left the scene to

attain a warrant when the mason jars were observed, Manning points out that Jackson

could not have personally seen them.  [R. 859 at 2.]  Furthermore, Manning argues that

this statement is inconsistent with the testimony of Trooper Moses.  [R. 852 at 2-3.]

According to Manning, "[t]hese discrepancies in the Affidavit clearly show that Officer

Jackson's statements were made with reckless disregard for the truth."  [*Id.* at 3.]

A cynic might be inclined to suggest that the references to "burn piles" and

"firearms" are affirmative misstatements, but the more likely, and equally well supported,

explanation is that they are scrivener's errors.  It is not intuitive to the Court why Officer

Jackson's case for a Search Warrant would be improved by inflating the number of guns

or burn piles present at the trailer.  The affidavit did not need such embellishment as it

was already well supported.  Manning has offered no proof to support a more insidious

conclusion.

Manning also alleges that the Affidavit failed to explain that some of the observations being included were not personal observations of its affiant, Officer Jackson.  From a factual standpoint and contrary to Manning's representation, the Affidavit did not say "Jackson saw 'Mason jars containing a milky liquid substance inside it.'"  [R. 859 at 2.]  The Affidavit said that "*officers* observed a very strong chemical smell along with Mason jars containing a milky liquid substance inside it."  [R. 796-2.]  Manning assumes that Jackson was one of the officers to which the affidavit referred.  The Court notes, however, that Jackson refers to himself in the affidavit at the *affiant*.  [See R. 796-2.]  Even if this was error, Manning presents no proof to support his theory that Officer Jackson's representations were intentional.  He also fails to suggest that the representations made about the mason jars were untrue.

"Allegations of deliberate falsehood or of reckless disregard for the truth" are inadequate unless they are also "accompanied by an offer of proof."  *Id.* at 171.  The Court cannot find that these arguments, standing alone, constitute a *substantial* preliminary showing that a "false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit."  *Id.* at 155. Practically, the Court understands how such errors are made.  Multiple officers were on the scene and a third officer (Dingus) was typing the affidavit which Deputy Jackson ultimately presented to the Judge.  These errors might support a finding of sloppiness but do not rise to the level of affirmative misstatements or omissions which *Franks* hearings are intended to address.

**4**

Finally, as the Magistrate Judge noted, even if it was determined that the Officers overstepped by walking around to the back of the house or by executing an improper protective sweep, the evidence still need not be suppressed.  [*See* R. 852 at 20-21.]  As the Sixth Circuit has expressed:

> it is well-settled that: when a search warrant is based partially on tainted evidence and partially on evidence arising from independent sources, if the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted.

*United States v. Love*, 561 F. App'x 480, 484 (6th Cir.), as amended (May 6, 2014), cert. denied, 135 S. Ct. 275 (2014) (quoting *United States v. Smith,* 730 F.2d 1052, 1056 (6th Cir.1984) (quotation marks omitted).  "An affidavit establishes probable cause when, "given all the circumstances set forth in the affidavit, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *United States v. Berry,* 565 F.3d 332, 338 (6th Cir. 2009)).  Even when one removes all references to evidence found behind and inside the trailer, enough evidence remains to support the issuance of a warrant.  As the Magistrate explained, the fact that (1) officers smelled a strong chemical odor coming from the trailer that they believed to result from the production of methamphetamine, (2) officers received no response after knocking on the door, and (3) the owner had recently purchased pseudoephedrine three times, was sufficient to support a search warrant.[4]

---

[4]   Manning also complains about the Magistrate's decision that the violation of Kentucky Rule of Criminal Procedure 13.10 does not warrant suppression.  [R. 859 at 4 ("While the Magistrate found the Search Warrant was not in compliance with Kentucky law under which it was issued, he inconsistently found that there was no Fourth Amendment violation.").]  He offers no argument to support this complaint nor does he offer any legal authority to show that a violation of that state rule equates to a Federal Constitutional Violation.  Accordingly, the Court does not consider the issue but, rather, adopts the Magistrate's recommendation.

## III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1.    The Defendant's Objections to the Magistrate Judge's Report and Recommendation [R. 859] are **OVERRULED**;

2.    The Magistrate Judge's Recommended Disposition [R. 852] is **ADOPTED,** for the reasons set forth in this Order, as and for the opinion of this Court; and

3.    The Defendant's Motions to Suppress Evidence [R. 754] is **DENIED.**

This 23rd day of February, 2015.

Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**